| | |
|---|---|
| TROY K. SCHEFFLER, | Case No. 15-CV-3707 (PJS/KMM) |
| Plaintiff, | |
| v. | |
| MARK McDONOUGH,<br>in his individual capacity acting under<br>color of law as a Coon Rapids Police<br>Officer, | |
| | ORDER |
| JOE PRICE,<br>in his individual capacity acting under<br>color of law as a Coon Rapids Police<br>Officer, | |
| and | |
| CITY OF COON RAPIDS, MINNESOTA,<br>a government entity and political<br>subdivision of the State of Minnesota, | |
| Defendants. | |

Peter J. Nickitas, PETER J. NICKITAS LAW OFFICE, L.L.C., and Paul
Applebaum, APPLEBAUM LAW FIRM, for plaintiff.

Ryan M. Zipf, LEAGUE OF MINNESOTA CITIES, for defendants.

Shortly after midnight on July 10, 2014, plaintiff Troy Scheffler approached

defendant Mark McDonough—a police officer who was sitting in a blacked-out squad

car surveilling the scene of a possible crime—and accused McDonough of following

him. The two men got into an argument, and McDonough handcuffed, arrested, and

allegedly assaulted Scheffler. Scheffler contends that McDonough did not have probable cause to arrest him and that McDonough used excessive force against him.

Scheffler should have brought two claims against McDonough under 42 U.S.C. § 1983: one for unlawful arrest and the other for excessive force. Instead, Scheffler filed a *17-count* complaint, including not only claims for unlawful arrest and excessive force, but 15 other claims that seem to have no real purpose. If the jury believes Scheffler's testimony, then his unlawful-arrest and excessive-force claims will allow him to recover every penny to which he is entitled (including attorney's fees and costs); the other 15 claims will result in no additional recovery. And if the jury does not believe Scheffler's testimony, then he is highly unlikely to be awarded damages on any of his claims. Most likely, then, the 15 additional claims will accomplish nothing but to create a great deal of needless work for the parties and the Court.

"This Court has repeatedly criticized the filing of 'kitchen-sink' or 'shotgun' complaints—complaints in which a plaintiff brings every conceivable claim against every conceivable defendant." *Gurman v. Metro Hous. & Redev. Auth.*, 842 F. Supp. 2d 1151, 1153 & n.2 (D. Minn. 2011) (collecting cases). One reason why kitchen-sink complaints are so often criticized is that they "unfairly burden defendants and courts" by "shift[ing] onto the defendant and the court the burden of identifying the plaintiff's genuine claims and determining which of those claims might have legal support." *Id.*

That is true in this case.  Both sides have moved for partial summary judgment, and thus the defendants and the Court must now trudge through 17 claims to separate the wheat from the chaff.

## I.  BACKGROUND

### A.  July 10, 2014

Shortly after midnight on July 10, 2014, police officers employed by defendant City of Coon Rapids ("Coon Rapids") were dispatched to a car dealership based on a report of a prowler or other disturbance.  Zipf Aff. Ex. 1 at 16; McDonough Aff. Ex. 12. Scheffler was biking home when he was passed by one or two of the squad cars that had been dispatched to the scene.  Zipf Aff. Ex. 1 at 76:2-20; Scheffler Dep. 80:6-81:10, 82:5-8.  The first squad car shined a light on Scheffler as it passed by him heading in the opposite direction.  Scheffler Dep. 80:6-18.  As Scheffler continued biking home, he came upon a parked squad car that was blacked out and facing against traffic.  Scheffler Dep. 81:16-82:12; *see also* McDonough Aff. Ex. 12.  McDonough was alone in the car, surveilling the car dealership in case a suspect tried to escape.  Zipf. Aff. Ex. 1 at 16:4-11; McDonough Aff. Ex. 12; Scheffler Dep. 88:22-24.

On seeing McDonough's squad car, Scheffler called 911, told the dispatcher that a police officer was following him and had stopped in front of him, and asked the dispatcher to tell the police officer to leave.  Zipf Aff. Ex. 1 at 29:9-16; Scheffler

Dep. 82:16-25.  The dispatcher suggested that Scheffler approach the police officer and

ask him what he was doing.  Zipf Aff. Ex. 1 at 30:9-18; Scheffler Dep. 91:21-92:9.

Scheffler followed the dispatcher's advice and approached the passenger side of the

squad car to question McDonough through the open window.  Scheffler Dep. 96-97.

The 911 operator stayed on the line, and thus the encounter between Scheffler and

McDonough was recorded.[1]

As he reached the squad car, Scheffler asked McDonough:  "Why are you here?"

Zipf Aff. Ex. 1 at 30:19-23; Scheffler Dep. 97:5-15.  McDonough replied by asking

Scheffler what *he* was doing.  Zipf Aff. Ex. 1 at 30:20; Scheffler Dep. 97:7-15.  Scheffler

responded that he was on his way home and minding his own business.  Zipf Aff. Ex. 1

at 30:25; Scheffler Dep. 98:2-7.

McDonough exited his squad car and asked Scheffler for identification.  Zipf Aff.

Ex. 1 at 31:1-2; Scheffler Dep. 97-98.  According to McDonough, Scheffler was

intoxicated and acting belligerent.  McDonough Aff. Ex. 12; Zipf Aff. Ex. 1 at 22:11-13,

24:17-23.  In fact, Scheffler had taken both Alprazolam (a generic version of Xanax) and

a sleeping pill earlier that day. Scheffler Dep. 76:10-77:4, 132:12-20.  On the 911

recording, Scheffler sounds intoxicated.

---

[1]The parties provided the Court with a recording of the 911 call, but not with a
transcript.  Therefore, the Court relies on the transcript of a January 4, 2016 hearing in
*Scheffler v. McDonough*, Anoka County File No. 02-CV-15-5963, at which hearing the
recording was played.  The Court also relies on its own review of the recording.

Scheffler refused to provide any identification or tell McDonough what he wanted. When McDonough asked "do you have an ID on you?," Scheffler responded, "doesn't matter." Zipf Aff. Ex. 7 at 2:31-33. Scheffler's response seemed to irritate McDonough, who told Scheffler: "Okay, listen, there's one of two ways this is going to go. Which way do you want it to go? Let me see your ID." Zipf Aff. Ex. 7 at 2:33-39.

After some more back and forth, McDonough asked Scheffler for his name, and Scheffler answered, "I don't have to respond to that." Zipf Aff. Ex. 1 at 31:8-19; Zipf Aff. Ex. 7 at 2:39-3:22. McDonough replied, "Well, then get the fuck out of here then." Zipf Aff. Ex. 1 at 31:20; Zipf Aff. Ex. 7 at 3:23-24. Scheffler refused to leave, but instead asked that McDonough's supervisor be called to the scene. Zipf Aff. Ex. 1 at 31:21. McDonough responded, "Sure." Zipf Aff. Ex. 1 at 31:22; Zipf Aff. Ex. 7 at 3:29-32. McDonough continued: "Here's what I am going to do. I am going to put you over here and put your hands behind you. . . ." Zipf Aff. Ex. 7 at 3:34-37. Scheffler asked if he was being arrested, and McDonough responded by again ordering Scheffler to put his hands behind his back. Zipf Ex. 7 at 3:37-41. Scheffler then asked why he was getting arrested, and, according to Scheffler, McDonough responded: "For being a fuck." (The 911 recording is not clear.) Zipf Aff. Ex. 1 at 32:5; Scheffler Dep. 105:20-22; *see also* Zipf Aff. Ex. 7 at 3:42-48.

At this point, the 911 recording captures what sounds like a physical altercation between Scheffler and McDonough, but their words are garbled, and their testimony about what happened conflicts. McDonough can be heard telling Scheffler—over and over again—to give McDonough his "other hand." Zipf Aff. Ex. 7 at 3:50-59. McDonough says that Scheffler was flailing his arms and resisting being handcuffed. McDonough Aff. Ex. 12. Scheffler denies that he resisted handcuffing.

The parties agree that Scheffler was then taken to the ground, but the parties dispute how. McDonough says that, because Scheffler was resisting handcuffing, McDonough swept Scheffler's legs from under him to bring Scheffler to the ground. McDonough Aff. Ex. 12. McDonough maintains that, even after being taken to the ground, Scheffler continued to resist handcuffing, so McDonough called for assistance. McDonough Aff. Ex. 12; *see also* Zipf Aff. Ex. 1 at 33:3-5. Defendant Joe Price—who, like McDonough, was a Coon Rapids police officer—responded to McDonough's call.

When Price arrived, he observed McDonough and Scheffler struggling on the ground. Price Aff. Ex. 13. Price states that he saw one handcuff on Scheffler's left hand and McDonough attempting to handcuff Scheffler's right hand. Price Aff. Ex. 13. Price then placed his right knee on Scheffler's shoulder in order to assist McDonough in getting a handcuff on Scheffler's right hand. Price Aff. Ex. 13. The officers further allege that, even after being handcuffed, Scheffler continued to resist, so the officers

held him down and checked him for weapons. Price Aff. Ex. 13. McDonough testified that he did not strike Scheffler. Zipf. Aff. Ex. 1 at 23:9-13; 24:8-10.

Scheffler tells a very different story. According to Scheffler, McDonough shoved Scheffler off his bike and onto the ground, knocking the wind out of him. Scheffler Dep. 105:14-25. Scheffler admits that McDonough asked for Scheffler's "other hand." Scheffler Dep. 106:25-107:3. But, according to Scheffler, McDonough was at that point trying to grab Scheffler's cell phone, which he was holding in that "other hand." According to Scheffler, he readily complied with McDonough's request, saying "it's right here." Scheffler Dep. 107:4-8, 107:20-108:7. Scheffler testified that, after getting Scheffler's cell phone, McDonough handcuffed Scheffler, dragged him up against the rear tire of the squad car, and repeatedly banged his head against the tire while interrogating him. Scheffler Dep. 111:24-112:13. McDonough denies Scheffler's allegations, but the 911 recording seems consistent with Scheffler's account:

| McDonough: | You got an i.d. [on] you? I said do you have an i.d.? You got an i.d.? |
|---|---|
| Scheffler: | Ow! |
| McDonough: | Do you have an i.d.? Do you? |
| Price: | Answer him. |
| McDonough: | Answer me. That's what you do. What's your name? |
| Scheffler: | Ow! |

| | |
|---|---|
| McDonough: | Hmm? |
| Scheffler: | Ow! |
| McDonough: | Do you remember your name yet? |
| Scheffler: | Ow! |
| McDonough: | Hmm?  Do you remember your name yet?  Hmm? . . . . |

Zipf Aff. Ex. 7 at 4:40-5:05.  Scheffler testified that Price not only watched McDonough assault him, but cheered McDonough on.  Scheffler Dep. 109:2-8, 112:14-23.

Scheffler claims that he was eventually knocked unconscious.  Scheffler Dep. 115:18.  The officers dispute this, and say that not only was Scheffler conscious at all times, but he continued to be belligerent.  McDonough Aff. Ex. 12; Price Aff. Ex. 13.

A squad video captured a conversation between McDonough and another officer that took place shortly after Scheffler was handcuffed and placed in the squad car.  *See* Nickitas Decl. Ex. C; Zipf Aff. Ex. 1 at 38:9-22.[2]  On the video, McDonough is heard saying that Scheffler is "fucking drunk as shit" and referring to Scheffler as "fuck face" and as an "asshole."  Zipf Aff. Ex. 1 at 38:12-16; Nickitas Decl. Ex. C.

---

[2]The parties provided the Court with a recording of this conversation, but not with a transcript.  Therefore, the Court again relies on the transcript of the January 4, 2016 hearing in *Scheffler v. McDonough*, Anoka County File No. 02-CV-15-5963, as well as the Court's own review of the recording.

McDonough cited Scheffler for obstructing the legal process in violation of Minn. Stat. § 609.50, subd. 1(2), Zipf Aff. Ex. 10, and transported Scheffler to the Anoka County Jail at approximately 1:15 am, Zipf Aff. Ex. 1 at 41:8-12; Scheffler Dep. 124:23-125:1. No medical care was provided to Scheffler at the scene. Scheffler Dep. 129:20-130:16. Scheffler says that, while he was in jail, he requested a nurse but was not provided one. Scheffler Dep. 240:15-241:5.

Scheffler was released from jail at about 2:00 pm on July 10, 2014 and went to an urgent care facility at about 6:15 pm complaining of pain and dizziness. Scheffler Dep. 133:1-6, 144:3-13; Nickitas Ex. J. The doctor diagnosed him with a concussion and noted scratches and marks on his head and body. Nickitas Decl. Ex. J. The next day, Scheffler submitted a request to Coon Rapids under the Minnesota Government Data Practices Act ("MGDPA"), seeking information regarding his arrest. Scheffler Dep. 145:16-20.

### B. August 22, 2014

On August 22, 2014, McDonough attended a hearing at the Anoka County Courthouse in connection with his divorce proceedings. Zipf Aff. Ex. 1 at 42:23-43:4; *see also* Nickitas Decl. Ex. K. The hearing had nothing to do with his work as a police officer—and, obviously, nothing to do with Scheffler. Scheffler nonetheless decided to show up at the hearing. Zipf Aff. Ex. 1 at 43:2-4. McDonough says that he perceived

Scheffler's presence at his divorce hearing as threatening and believed that Scheffler crossed a line by intruding into the personal life of a police officer. Zipf Aff. Ex. 1 at 70:7-17. McDonough glanced towards Scheffler, and Scheffler looked McDonough in the eye and smiled—something that McDonough perceived as threatening. Zipf Aff. Ex. 1 at 70:25-71:10. McDonough consequently told his attorney that he felt threatened by Scheffler's presence, and McDonough's attorney asked the judge to have Scheffler removed from the courtroom. Zipf Aff. Ex. 1 at 46:5-8; Nickitas Decl. Ex. K at 4:5-15. Scheffler interrupted the hearing to object to being removed, and he was allowed to remain in the courtroom. *See* Nickitas Decl. Ex. K at 4:16-24. Scheffler later interrupted the proceedings a second time and sought to tell the Court and McDonough's ex-wife's attorney why he was there. Nickitas Decl. Ex. K at 9:3-25.

Following the hearing, Scheffler approached McDonough in the hallway, and McDonough told him to stay away. Zipf Aff. Ex. 1 at 43:13-15, 44:23-45:3. Scheffler was with another individual at the time, and McDonough felt outnumbered and frightened. Zipf Aff. Ex. 1 at 70:7-24.

McDonough told his supervisor, Captain Paul Ireland, about Scheffler's presence at the divorce hearing because McDonough feared for his safety and the safety of his family. Zipf Aff. Ex. 1 at 44:2-13; Ireland Dep. 58:16-59:5. Captain Ireland, thinking that it was troubling for a defendant to intrude into an arresting officer's personal life,

contacted the Anoka Police Department because the courthouse was within its jurisdiction.  Ireland Dep. 59:23-60:17, 64:12-14; Nolan Dep. 36:22-37:4.  Captain Scott Nolan of the Anoka Police Department then called McDonough and interviewed him about what had happened at the divorce proceeding.  Nolan Dep. 37-40.  During that call, McDonough again expressed concern for his own safety and the safety of his family.  Nolan Dep. 40:21-41:5, 71:9-72:7; Zipf Ex. 1 at 45:19-46:4.  Nolan testified that neither McDonough nor anyone from Coon Rapids attempted to influence the way that Anoka handled the situation.  Nolan Dep. 72:8-14.

Captain Ireland also reported the incident to Coon Rapids City Attorney David Brodie.  Brodie Dep. 7:9-17.  Brodie then successfully sought an order prohibiting Scheffler from having further contact with McDonough.  Brodie Dep. 10-18.  Brodie did not communicate with McDonough about either the incident or the no-contact order.  Brodie Dep. 9:12-17, 14:8-17.  The underlying charges against Scheffler were dismissed on October 31, 2014, and the no-contact order was vacated upon dismissal of the charges.  Nickitas Decl. Exs. N, O.

## II.  ANALYSIS

### A.  *Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

"might affect the outcome of the suit under the governing [substantive] law."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Id.* at 255.

### B.  Unlawful Detention and Arrest

Scheffler brings six claims challenging his detention and arrest.  Two of the

claims (Counts VI and VII) are brought against McDonough under § 1983 and allege

that McDonough violated Scheffler's rights under the Fourth Amendment.  Four of the

claims are brought under the common law of Minnesota:  false-arrest claims against

McDonough (Count VIII) and Coon Rapids (Count IX) and false-imprisonment claims

against McDonough (Count X) and Coon Rapids (Count XI).  Both Scheffler and the

defendants seek summary judgment on these claims.

In moving for summary judgment, defendants argue that the federal claims are

barred by the doctrine of qualified immunity and the state claims are barred by the

doctrine of official immunity.[3]  At oral argument, both sides agreed that, under the

_____

[3]"Under Minnesota law, official immunity protects police officers engaged in law
enforcement efforts unless they act with subjective malice."  *Wertish v. Krueger*, 433 F.3d
1062, 1067 (8th Cir. 2006).  "Subjective malice" is found where "the official has

(continued...)

circumstances of this case, if the defendants have qualified immunity, they also have official immunity—and if they do not have qualified immunity, they also do not have official immunity. Thus the Court will analyze only the issue of qualified immunity.

Qualified immunity protects a police officer from personal liability in a § 1983 action unless the officer's conduct violated a clearly established constitutional or statutory right. *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012). Whether an officer is entitled to qualified immunity depends on two questions: "'(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" *Id.* at 730-31 (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009)). A court may address the questions in any order, but the officer will be found immune unless both questions are answered affirmatively. *Id.* at 731. When a party moves for summary judgment on the ground of qualified immunity, "'[t]he party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences.'" *Id.* at 730 (quoting *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008)).

---

[3](...continued)
intentionally committed an act that he or she had reason to believe is prohibited." *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994).

## 1. Before the Arrest

It is not clear whether Scheffler alleges that McDonough acted unlawfully before attempting to handcuff Scheffler.[4]  It is clear, however, that Scheffler alleges that McDonough acted unlawfully when he attempted to place handcuffs on Scheffler.

Under the Fourth Amendment, officers may "conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about to commit a crime."  *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010).  The officers must be able to identify "specific, articulable facts" that justify the stop.  *Id.*  Whether the officers had reasonable suspicion to conduct a stop is determined by the totality of the circumstances.  *Id.*

After a suspect is lawfully stopped, an officer may in some circumstances conduct a pat-down search for weapons.  *Id.* at 940-41.  To justify the search, the officer must have reasonable, articulable suspicion that the suspect is armed and dangerous.  *Id.*  The officer need not know for certain that the suspect is armed; instead, a search is permitted "if a 'reasonably prudent man in the circumstances would be warranted in

_____

[4]Even if Scheffler were making such a claim, it would be meritless.  Scheffler approached McDonough and engaged him in conversation.  Until the point at which McDonough attempted to place handcuffs on Scheffler, there was no seizure of Scheffler within the meaning of the Fourth Amendment.  *Cf. United States v. Dortch*, No. 16-3178, 2017 WL 3567825, at *2 (8th Cir. Aug. 18, 2017) (officer did not seize defendant by approaching him and asking why he was standing in the road and whether he had a gun).

the belief that his safety or that of others was in danger.'" *Id.* at 941 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  Officers may also place a suspect in handcuffs if doing so is "reasonably necessary to protect their personal safety and to maintain the status quo during the stop." *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006); *see also Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005) ("[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case.").

One additional source of authority to detain citizens must be noted.  Police officers perform "community caretaking functions" that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).  A police officer acts as a community caretaker when he acts to "help those in danger." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006).  The Eighth Circuit has long "recognized that such a 'community caretaker' classification may justify noninvestigatory searches and seizures in certain limited situations." *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) (quoting *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014) (compiling cases that have applied the community caretaker doctrine to non-investigatory seizures)).

Minnesota has codified some of the community-caretaking responsibilities of police officers at Minn. Stat. § 253B.05, subd. 2(a), which authorizes a police officer to "take a person into custody and transport the person to a licensed physician or treatment facility if the officer has reason to believe . . . that the person is mentally ill or developmentally disabled and in danger of injuring self or others if not immediately detained." The statute also authorizes a police officer to "take a person who is believed to be chemically dependent or is intoxicated in public into custody and transport the person to a treatment facility." *Id.* If such a person "is not in danger of causing self-harm or harm to any person or property," the statute authorizes the police officer to "transport the person home" instead of to a treatment facility. *Id.*

The Court finds that McDonough is entitled to qualified immunity for all of his actions—including his attempt to handcuff Scheffler—up to the point at which he arrested Scheffler. McDonough was sitting alone in a blacked-out police car after midnight when Scheffler suddenly appeared and, out of the blue, demanded to know what McDonough was doing. (Although Scheffler was following the advice of the 911 dispatcher, McDonough did not know that.) At the time, McDonough was surveilling an active crime scene. Scheffler's speech was slurred, and he was having difficulty putting his thoughts into words. Scheffler bizarrely asked McDonough why he had been following Scheffler. Scheffler refused to give his name, refused to produce

identification, and was generally combative. After McDonough told Scheffler to "get the fuck out of here," Scheffler refused to leave, thus continuing to interfere with McDonough's attempts to surveil a crime scene.

Under these circumstances, a reasonable officer in McDonough's position could have had concerns for his own safety, could have believed that Scheffler was intoxicated or mentally ill, and could have suspected Scheffler of having some connection to criminal activity at the car dealership. Moreover, a reasonable officer in McDonough's position could have concluded that Scheffler was interfering with his surveillance and would not let McDonough return to his work. Thus, a reasonable officer could have concluded that it would not have violated clearly established law to question Scheffler, to ask him to identify himself, and to order him to leave the scene—and, when Scheffler refused to leave the scene, to place him in handcuffs in order to immobilize him until he could be removed and keep the officer safe.

In arguing to the contrary, Scheffler again and again points to evidence that McDonough was not *in fact* concerned for his own safety, that McDonough was not *in fact* concerned about Scheffler's well-being, and that McDonough did not *in fact* suspect Scheffler of being involved in criminal activity. All of this may be true. But "[q]ualified immunity is an affirmative defense governed by an objective standard in which 'the defendant's subjective intent is simply irrelevant.'" *Jackson v. Gutzmer*, No. 16-2184,

2017 WL 3426436, at *5 (8th Cir. Aug. 10, 2017) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998)). The critical question is not what motivated McDonough, but whether a hypothetical reasonable officer, under the same circumstances, could have believed that engaging in the challenged actions would not violate clearly established law.

For these reasons, Counts VI, VII, VIII, IX, X, and XI are dismissed insofar as they are based on the actions of McDonough before he arrested Scheffler.

## 2. The Arrest

Scheffler was arrested for obstructing the legal process in violation of Minn. Stat. § 609.50, subd. 1(2). "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522-23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). A law enforcement officer has probable cause "when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Id.* at 523 (quoting *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010)). If an officer arrests a suspect under the mistaken belief that there is probable cause, arguable probable cause exists "if the mistake is 'objectively reasonable.'" *Id.* (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)).

Here, McDonough argues that he had probable cause—or, at the very least, arguable probable cause—because Scheffler obstructed the legal process by physically resisting McDonough's attempts to handcuff him.  The parties also agree—consistent with the case law—that a suspect who physically resists a police officer's attempt to handcuff him obstructs the legal process, even if the handcuffing itself is unlawful.  *See Hill v. Scott*, 349 F.3d 1068, 1074 (8th Cir. 2003); *State v. Wick*, 331 N.W.2d 769, 771 (Minn. 1983); *In re Burns*, 284 N.W.2d 359, 360 (Minn. 1979).

The problem for McDonough is that Scheffler adamantly *denies* that he resisted McDonough's attempts to handcuff him.  Although the 911 recording appears to support McDonough's version—he tells Scheffler at least three times to put his hands behind his back, and then tells him at least four times to "give me your other hand"—the matter is not clear.  According to Scheffler, McDonough was trying to take Scheffler's phone away from him, and that accounts for McDonough's demands to "give me your other hand."  (It does not, however, account for McDonough's preceding demands to "put your hands behind your back.")  Scheffler says that he gave his cell phone to McDonough as requested (at the point where Scheffler is heard saying "it's right here")—and Scheffler insists that he no way resisted the handcuffing.  (Scheffler points out that, on the 911 recording, he is heard telling McDonough "I'm not resisting," and McDonough is heard responding "I know.")

Under the circumstances, the Court cannot grant summary judgment to either side on Scheffler's claims challenging the lawfulness of his arrest. If Scheffler did physically resist handcuffing, the arrest was lawful, as McDonough had probable cause to conclude that Scheffler obstructed the legal process. And if Scheffler did not physically resist handcuffing, the arrest was not lawful, as McDonough did not have probable cause to conclude that Scheffler obstructed the legal process, and as McDonough has not pointed to any other justification for arresting Scheffler. This issue must be decided by a jury. *See Kukla v. Hulm*, 310 F.3d 1046, 1049 (8th Cir. 2002) ("[I]f the arrestee challenges the officer's description of the facts and presents a factual account that would not permit a reasonable officer to make an arrest, then there is a material factual dispute precluding summary judgment."); *Gainor v. Rogers*, 973 F.2d 1379, 1385 (8th Cir. 1992) ("[W]here there are genuine issues of material fact surrounding an arrestee's conduct it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law.").

## C. *Excessive Force*

Scheffler brings four claims arising out of McDonough's use of force in the course of handcuffing and detaining him. Scheffler brings an excessive-force claim under the Fourth Amendment (Count II) and a common-law battery claim under

Minnesota law (Count IV) against McDonough; a claim against Price for not intervening and protecting Scheffler against McDonough's excessive force (Count III)[5]; and a claim seeking to hold Coon Rapids liable for McDonough's battery (Count V). Scheffler moves for summary judgment on these claims, arguing that McDonough beat him severely and that Price egged McDonough on, and thus that both officers (and Coon Rapids) are liable to him.

The problem for Scheffler is that, although the 911 recording appears to support his allegations, McDonough and Price adamantly deny that McDonough beat Scheffler in the manner that Scheffler alleges. Instead, McDonough and Price say that they used only the minimum force necessary to get the handcuffs on Scheffler—who, they say, physically resisted their efforts. The officers specifically deny that McDonough struck Scheffler or banged his head against a tire, as Scheffler alleges. Given that the parties sharply dispute whether Scheffler physically resisted handcuffing and what force was used against him, the issue of excessive force must be decided by a jury.

### D. Retaliation

In Count I of his complaint, Scheffler alleges that he was exercising his First Amendment rights when he challenged McDonough and asked him to have a supervisor come to the scene. Scheffler further alleges that McDonough arrested and

---

[5]A police officer may be held liable for failing to prevent another police officer from using excessive force. *See Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009).

assaulted him in retaliation for his "peaceful exercise of free speech critical of the law enforcement officer, McDonough . . ." Compl. ¶ 95. Scheffler moves for summary judgment on this claim.

Scheffler's claim is similar to the claim brought by the plaintiff in *Peterson v. Kopp*, 754 F.3d 594 (8th Cir. 2014). In that case, the plaintiff alleged that a public-transit officer arrested and pepper sprayed him in retaliation for his being critical of the officer and asking for the officer's badge number. The Eighth Circuit described the applicable law as follows:

> "To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (citing *Naucke v. City of Park Hills*, 284 F.3d 923, 927-28 (8th Cir. 2002)). Under the third prong, a plaintiff must show that the retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010). In other words, the plaintiff must show he was "singled out because of [his] exercise of constitutional rights." *Id.* (quotation omitted); *see also Hartman*, 547 U.S. at 256 ("[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution.").

*Peterson*, 754 F.3d at 602. The Eighth Circuit added that, when the alleged retaliation takes the form of an *arrest*, "we have identified a fourth prong: lack of probable cause or arguable probable cause." *Id.*

The parties do not dispute that Scheffler engaged in protected activity, nor do the parties dispute that being arrested and being battered in the way claimed by Scheffler "would chill a person of ordinary firmness from continuing in the activity." *Id.* But the parties dispute whether McDonough had arguable probable cause for arresting Scheffler—a dispute that turns on whether Scheffler physically resisted McDonough's efforts to handcuff him. The parties also dispute whether McDonough arrested Scheffler in retaliation for his protected activity. The parties also dispute exactly what force McDonough used against Scheffler. And the parties dispute whether McDonough used that force in an effort to overcome physical resistance to being handcuffed or instead to retaliate for protected activity. Because so many material facts are in dispute, the Court cannot grant summary judgment to Scheffler on this claim.

### E.  Failure to Provide Medical Care

In Count III, Scheffler alleges that McDonough and Price failed to provide medical care to Scheffler after he was injured by McDonough. Compl. ¶ 113. For the reasons stated at oral argument, the Court grants summary judgment to defendants on this claim. To briefly recap:

First, Scheffler has provided no evidence that McDonough or Price "had actual knowledge that failing to provide [Scheffler] immediate medical treatment posed a substantial risk of serious harm." *Carpenter v. Gage*, 686 F.3d 644, 651 (8th Cir. 2012). Second, Scheffler has provided no evidence that McDonough or Price acted with "'a mental state akin to criminal recklessness'" when they did not get medical help for him, particularly given that Scheffler was turned over to jail authorities within an hour after being injured. *Thompson v. King*, 730 F.3d 742, 746-47 (8th Cir. 2013) (quoting *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009)). And third, Scheffler has admitted that he has no evidence that his injuries—cuts, bruises, and a concussion—were exacerbated in any way by the officers' alleged indifference to his medical needs. *See Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (stating that a plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment" in order to withstand summary judgment (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997))).

## F. Monell *Claim*

In Count XVII, Scheffler seeks to hold Coon Rapids liable under *Monell v. Department of Social Services, City of New York*, 436 U.S. 658 (1978). To succeed on his *Monell* claim, Scheffler must prove that Coon Rapids adopted some policy, custom, or

practice, and that the policy, custom, or practice was the moving force behind a

violation of Scheffler's federal rights.  *Id.* at 694.

To establish a "custom" or "practice" sufficient to support a *Monell* claim,

Scheffler must demonstrate three things:

> "(1)    The existence of a continuing, widespread, persistent
>         pattern of unconstitutional misconduct by the
>         governmental entity's employees;
>
> (2)     Deliberate indifference to or tacit authorization of
>         such conduct by the governmental entity's
>         policymaking officials after notice to the officials of
>         that misconduct; and
>
> (3)     [Injury to Scheffler] by acts pursuant to the
>         governmental entity's custom, *i.e.*, [proof] that the
>         custom was the moving force behind the
>         constitutional violation."

*Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (quoting *Jane Doe A ex rel. Jane*

*Doe B v. Special Sch. Dist. of St. Louis Cty.*, 901 F.2d 642, 646 (8th Cir. 1990)).  A single

occurrence is generally not sufficient to show a policy, custom, or practice.  *Ulrich v.*

*Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013).

In support of his *Monell* claim, Scheffler points to three things:

*First*, Scheffler alleges that, in the course of unrelated litigation with Coon

Rapids,[6] he received falsified lien documents from the city.  ECF No. 88 at 39-40.  He

_____

[6]Scheffler is one of Minnesota's most prolific litigants, having brought two dozen
(continued...)

also alleges that, in his pursuit of a no-contact order, Captain Ireland falsely stated that Scheffler had filed reports against McDonough and had made "multiple requests for access on McDonough." Compl. ¶¶ 168-69. These allegations fall far short of establishing a "continuing, widespread, persistent pattern of unconstitutional conduct" that was known and tolerated by policymaking officials. Moreover, because Scheffler alleges that Captain Ireland made his false report on August 29, 2014, Compl. ¶ 168, the false report could not have been the "moving force" behind the events of July 10, 2014.

*Second*, Scheffler argues that Coon Rapids ratified McDonough's and Price's misconduct by failing to discipline them. Of course, this, too, occurred after the events of July 10, 2014, and thus could not have been the "moving force" behind those events. And the fact that Coon Rapids did not discipline McDonough and Price falls far short of establishing that, *prior* to July 10, 2014, McDonough and Price— or anyone else—had engaged in a "continuing, widespread, persistent pattern of unconstitutional conduct" that was known and tolerated by policymaking officials. If a municipality's decision not to discipline police officers accused of misconduct was sufficient to establish *Monell* liability, then such liability would be the rule rather than the rare exception.

---

[6](...continued)
federal lawsuits in the past eight years or so, and having been involved in a number of other criminal and civil proceedings in state court.

Finally, Scheffler claims that he is aware of other unconstitutional actions by Coon Rapids police officers. The only such action that Scheffler specifically describes occurred in September 2012, when four police officers prevented a suicidal citizen from jumping off a bridge. Compl. ¶ 172. According to Scheffler, these officers acted unconstitutionally because a video of the incident "showed the officers tase the would-be suicide and strike the would-be suicide, when the individual was not a threat to the officers." *Id.* Putting aside the fact that there is no evidence that the officers acted unconstitutionally in saving the citizen's life—conduct for which they received commendations—"[a] single incident normally does not suffice to prove the existence of a municipal custom." *Mettler*, 165 F.3d at 1205.

In sum, the evidence in the record comes nowhere near establishing a continuing, widespread, and persistent pattern of unconstitutional misconduct that was known and tolerated by Coon Rapids and that was a moving force behind the events of July 10, 2014. The Court therefore grants Coon Rapids's motion for summary judgment on Count XVII.

### G. Malicious Prosecution

Scheffler brings two malicious-prosecution claims, one against McDonough (Count XII) and the other against Coon Rapids (Count XIII). Under Minnesota law, a plaintiff must prove four things to make out a claim for malicious prosecution: (1) the

defendant initiated criminal proceedings against the plaintiff; (2) the defendant acted without probable cause; (3) the defendant acted with malice; and (4) the proceedings terminated in the plaintiff's favor. *See Cox v. Lauritsen*, 147 N.W. 1093, 1094 (Minn. 1914); *Jordan v. Lamb*, 392 N.W.2d 607, 609 (Minn. Ct. App. 1986).

There is no dispute that Coon Rapids initiated criminal proceedings against Scheffler and did so based on McDonough's report. There is also no dispute that those criminal proceedings terminated in Scheffler's favor. As discussed above, however, there is a dispute over whether McDonough had probable cause to arrest Scheffler—a dispute that turns on whether Scheffler physically resisted handcuffing. There is also a dispute over whether McDonough acted with malice. The Court therefore denies defendants' motion for summary judgment on Counts XII and XIII.

## H.  Abuse of Process

Scheffler brings two abuse-of-process claims, one against McDonough (Count XIV) and the other against Coon Rapids (Count XV). Process was abused, according to Scheffler, when the defendants sought a no-contact order against him after he showed up at McDonough's divorce hearing. These are rather puzzling claims; Scheffler wants McDonough and Coon Rapids to pay him damages because he was ordered to stay away from McDonough, yet Scheffler (unsuccessfully[7]) attempted to

_____

[7]Scheffler's petition was denied, and Scheffler unsuccessfully appealed to the
(continued...)

have McDonough ordered to stay away from him.  In any event, defendants move for summary judgment on these claims.

To recover for abuse of process, a plaintiff must prove that the defendant acted for an ulterior purpose and used the process to accomplish an unlawful end for which the process was not designed or intended.  *Kittler & Hedelson v. Sheehan Props., Inc.*, 203 N.W.2d 835, 840 (Minn. 1973).  No reasonable jury could find, based on the evidence in the record, that Scheffler has established these elements.

To begin with, there is no evidence that McDonough sought the no-contact order. Rather, it is undisputed that it was McDonough's supervisor who contacted the City Attorney about Scheffler's appearance at McDonough's divorce hearing and that it was the City Attorney who decided to seek the no-contact order.  There is no evidence of any contact whatsoever between McDonough and the City Attorney regarding the no-contact order.  Therefore, even if *someone* abused the judicial process, that someone was not McDonough.

Further, even if McDonough had sought the no-contact order, there is no evidence that he acted with an ulterior purpose or that he used the process to accomplish an end for which it was not intended.  A few weeks after McDonough had a

[7](...continued)
Minnesota Court of Appeals.  *See Scheffler v. McDonough*, A16-0949, 2017 WL 1549979 (Minn. Ct. App. May 1, 2017), *rev. denied* (Minn. July 18, 2017).

physical encounter with Scheffler in the course of arresting him, Scheffler interjected himself into McDonough's divorce hearing—a private matter that had nothing to do with Scheffler or with the events of July 10, 2014. McDonough was understandably concerned about his safety, a reaction that would be shared by almost any police officer who had a recently arrested criminal defendant intrude into the officer's personal life in this manner. The no-contact order was sought for exactly the purpose for which it was designed: To keep someone who is perceived as threatening away from the person who feels threatened. For these reasons, the Court grants McDonough's motion for summary judgment on Count XIV.

The Court likewise grants summary judgment to Coon Rapids on Count XV. Because McDonough cannot be held liable, Coon Rapids cannot be held vicariously liable for his actions. And there is no evidence that would make Coon Rapids directly liable. All evidence in the record suggests that the City Attorney had a legitimate reason to seek a no-contact order and sought such an order for precisely the reason that such orders exist. It may be that the City Attorney erred in seeking—and that the state judge erred in granting—a no-contact order. Prosecutors and judges are human, and they make mistakes. But there is no evidence that the City Attorney abused the judicial process.

*I. MGDPA Retaliation*

Finally, Scheffler sues Coon Rapids for "MGDPA Retaliation." Specifically, Scheffler alleges that Coon Rapids sought the no-contact order to retaliate against him for exercising his rights under the MGDPA. There are two problems with Scheffler's claim:

First, nothing in the MGDPA suggests—and no court has held—that a plaintiff can bring a claim for "MGDPA retaliation." A number of Minnesota statutes authorize a cause of action for retaliation.[8] The MGDPA is not one of them, despite the fact that the Minnesota Legislature gave significant attention to the question of what remedies should be available for violations of the statute. *See* Minn. Stat. § 13.08. Under the circumstances, the Court will not recognize a new cause of action for "MGDPA retaliation." *Cf. Becker v. Mayo Found.*, 737 N.W.2d 200, 207 (Minn. 2000).

Second, even if such a cause of action existed, the Court would grant Coon Rapids's motion for summary judgment, as the record does not contain sufficient evidence of a nexus between Scheffler's request under the MGDPA and the City Attorney's decision to seek a no-contact order.

---

[8]*See, e.g.*, Minn. Stat. § 363A.15 (prohibiting "any reprisal against any person" who has engaged in certain protected activities); Minn. Stat. § 181.937 (prohibiting "any reprisal against an employee for declining to participate in contributions or donations to charities or community organizations"); Minn. Stat. § 626.556, subd. 4a (prohibiting retaliation against mandatory reporters who make good-faith reports of abuse or neglect).

For these reasons, the Court grants Coon Rapids's motion for summary judgment on Count XVI.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Plaintiff's motion for partial summary judgment [ECF No. 85] is DENIED.

2.    Defendants' motion for partial summary judgment [ECF No. 77] is GRANTED IN PART and DENIED IN PART as follows:

    a.    Defendants' motion is GRANTED as to the following claims, and those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS:

        i.    Count III, insofar as it asserts a claim for failure to render first aid;

        ii.    Counts VI, VII, VIII, IX, X, and XI, insofar as they are based on the actions of McDonough before he arrested Scheffler; and

        iii.    Counts XIV, XV, XVI, and XVII.

b.      Defendants' motion is DENIED in all other respects.


Dated: August 23, 2017                          s/Patrick J. Schiltz                         
                                                Patrick J. Schiltz
                                                United States District Judge